

# ARKANSAS COURT OF APPEALS
## DIVISION IV
**No.** CV–17–333

|  |  |
|---|---|
| KIMBERLY E. GRINDSTAFF<br>APPELLANT<br><br>V.<br><br>JOSEPH D. STRICKLAND AND MINOR CHILDREN<br>APPELLEES | **Opinion Delivered:** November 29, 2017<br><br>APPEAL FROM THE BENTON COUNTY CIRCUIT COURT<br>[NO. 04DR-14-386]<br><br>HONORABLE DOUG SCHRANTZ, JUDGE<br><br>AFFIRMED |

### RITA W. GRUBER, Chief Judge

Kimberly Strickland (now Grindstaff) and Joseph Strickland were divorced by order of the Circuit Court of Benton County on April 9, 2014. Ms. Grindstaff was granted custody of the two minor children, who were then six years old and ten months old. Mr. Strickland was given standard visitation and was ordered to pay child support, and the parties agreed to jointly decide "matters concerning the children: medical decisions, school and extracurricular activities." The order also included a non-cohabitation clause that stated in part, "Neither party . . . shall allow any third parties to co-habit in their residence or place of lodging while the child(ren) is present." Under an agreed order entered by the court on November 6, 2015, Ms. Grindstaff retained primary custody and was allowed to live in Springdale in the same residence with her new husband. The order specified details for visitation exchanges in Springdale and Siloam Springs, where she had previously lived.

Mr. Strickland subsequently filed a petition for modification of custody, contempt, and reinstatement of the attorney ad litem. His petition included the following allegations of a material change in circumstances: (a) alienation by Ms. Grindstaff; (b) failure to permit Mr. Strickland's Father's Day visit in 2016; (c) failure to inform him of school activities; (d) requiring the school to notify her if he visited the minor children; (e) informing the school that he was not permitted to check out the children; (f) failure to list him as "father" on school paperwork; (g) suggesting that he "sign over his rights to the children"; (h) sending the children to their stepfather's automotive shop without proper care and permitting them to accompany him on repossessions and towing at accident scenes; and (i) residing in a home with as many as eight people, including an unmarried couple. The petition asked that Ms. Grindstaff be found in contempt for violations of court orders, which included failing to remove Mr. Strickland's name from car registration and to transfer insurance coverage pursuant to the divorce decree. Ms. Grindstaff filed an answer and a counterpetition for contempt. She alleged that Mr. Strickland had failed to properly communicate with her regarding the children, to provide health insurance for the children when she lost her employment, and to provide an environment "conducive for a conversation" in her telephone visitation with the children; that he had permitted third parties to consume alcohol in the children's presence; and that he was $315.28 behind in child support.

At the conclusion of the November 30, 2016 hearing on the petitions, the court orally ruled that the "cumulative effect" of the evidence constituted cause for an immediate change of custody. On the same date, the court entered a written order granting Mr. Strickland the immediate change of custody, eliminating the previous order's provision that

the parties would jointly decide specific matters regarding the children, and setting child support and visitation for Ms. Grindstaff. The court found her in contempt, ordered her to pay attorney's fees and costs, and dismissed the contempt action against Mr. Strickland, finding that any contemptuous actions on his part had been "de minimis."

Ms. Grindstaff now appeals. She contends that the trial court erred (1) in finding a material change of circumstances, (2) in finding that a change of custody was in the best interest of the children, and (3) in changing custody before using contempt powers to correct her contemptuous behavior. We affirm.

A judicial award of custody will not be modified unless it is shown that there are changed conditions demonstrating that a modification of the decree will be in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to, or not known by, the trial court when the original custody order was entered. *Campbell*, 336 Ark. at 383–84, 985 S.W.2d at 727. Generally, to promote stability and continuity in the life of the child and to discourage repeated litigation of issues that have already been decided, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. *Id*. at 384, 985 S.W.2d at 727. The party seeking modification has the burden of showing a material change in circumstances. *Id*.

We review child-custody cases de novo, but we will not reverse a trial court's findings unless they are clearly erroneous. *Taylor v. Taylor*, 353 Ark. 69, 77, 110 S.W.3d 731, 735 (2003). Because the question of whether the trial court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the

3

superior position of the trial court to evaluate the witnesses, their testimony, and the child's best interest. *Sharp v. Keeler*, 99 Ark. App. 42, 44, 256 S.W.3d 528, 529 (2007). There are no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving minor children. *Neumann v. Smith*, 2016 Ark. App. 14, at 12, 480 S.W.3d 197, 204. If the trial court fails to make findings of fact about a change in circumstances, we may nonetheless conclude on de novo review that there was sufficient evidence from which the trial court could have found a change of circumstances. *Williams v. Geren*, 2015 Ark. App. 197, at 10, 458 S.W.3d 759, 766. We do so in this case.

I. *Whether the Trial Court Erred in Finding a Material Change of Circumstances*

Ms. Grindstaff first contends that the trial court erred in finding a material change of circumstances. She complains that the court "stated that it was the cumulative effect of the following actions on [her] part" that led the court to change custody: (1) asking Mr. Strickland to allow her husband to be present at one meeting with the parties and the children; (2) an inadequate job of notifying Mr. Strickland of the children's activities; (3) miserable communication between the parties; (4) one occasion of asking Mr. Strickland if he wanted to relinquish his parental rights; (5) refusing to give Mr. Strickland the business address of her husband's auto repair shop, where the children spent time; (6) admitting that the parties were making joint decisions almost 100 percent of the time; (7) cohabitation of a couple in her residence; and (8) incorrectly filling out school-registration forms. She relies on evidence at the November 2016 hearing that she asserts was in her favor on these points.

On the first point, Ms. Grindstaff points to her testimony about "a single occurrence" when she had suggested that she, Mr. Strickland, and the children "talk about the future" following the November 2015 order—a meeting that did not happen because of the presence of her new husband. She explains that she had wanted his attendance, as well as that of Mr. Strickland's new wife, because "all four have responsibilities with the children." Next, she notes Mr. Strickland's testimony that he had not been notified of a dental appointment, where one of the children got a silver tooth, and that he had missed a field trip because of her failure to notify him. She states that she was working on her communication and that Mr. Strickland had acknowledged the recent improvement. She complains that a particular text from him was "as rude and disrespectful" as the ones that he complained about from her. She also argues that residing with the cohabitating couple, her father-in-law and Diane McGraw, is not a material change in circumstances because she had been residing with them at the time of the previous order and because Mr. Strickland had not objected then. She points to her and Ms. McGraw's undisputed testimony that at the time of the previous custody order, Ms. Grindstaff had married and moved to Springdale with her husband, and she and the children "were residing in the home of a 70-year-old unmarried couple."

Mr. Strickland responds that there was conflicting testimony on the points listed by Ms. Grindstaff and that the trial court properly identified a number of factors showing a material change in circumstances. He argues that the crux of these factors was that Ms. Grindstaff had done a "miserable job" communicating with him, as shown through testimony, emails, and texts in evidence at the hearing.

The ad litem in this case, who had met with both parents at his office and with the children at each parent's home, testified that the children showed him their toys at Mr. Strickland's house, where they seemed happy, talkative. He further testified,

I walked with one [of the children] down the street, and she expressed a preference to live with her dad. Later I received an email from Ms. Grindstaff's attorney stating that the child had told her mother about our conversation but that she now wanted to live with her mom. I went to visit her at Ms. Grindstaff's home. We walked down the street again and chatted. She said, "I told you at my dad's house I want to live with my dad, but I want to live with my mom." She said she got to do "fun stuff" with mom.

I asked her if she spoke to her mom about her conversation with me when she stated she wanted to live with Mr. Strickland. She said yes, and that her mother told her in response that she "wouldn't get to do fun stuff." It was interesting to me that the exact reason she gave was a repeat of what Ms. Grindstaff told her. Additionally, at Ms. Grindstaff's house, the children were a little more standoffish, not as open, and not as interactive with me.

Regarding the parties' decision at the time of divorce to jointly decide certain matters, the ad litem testified:

Ms. Grindstaff has failed miserably in that respect. Based on the evidence the court saw today, there was a pretty concerted effort to marginalize Mr. Strickland's involvement in the children's lives, such as telling him to sign over his rights and putting on school forms that Ms. Grindstaff has to know whenever Mr. Strickland is up there.

The ad litem testified that he was also concerned about Ms. Grindstaff's having "absolutely no problem with cohabitation in her house, knowing it's a violation of the court order."

Finally, the ad litem testified that he had considered whether the court's contempt powers would be sufficient to bring Ms. Grindstaff to her senses:

[H]er conduct here was pretty egregious, and so it is my opinion as ad litem that there has been a material change in circumstances as far as parental alienation, and it would be in the best interests of the children for Mr. Strickand to be the primary custodian. He has had to fight and fight and fight against Ms. Grindstaff to be

involved and to be a father to his children. A finding of contempt would not be sufficient to change her behavior.

The trial court made extensive oral findings of fact at the hearing's conclusion, stating that it had weighed the reasonableness and credibility of the testimony and that the findings were based on such things as the parties' body language and responses to questions. First, the court addressed the parties' relationship:

> [W]hile you've never been in a position where you've had a contested hearing here before, had you been, I would be telling you a few things that you need to know in order for you to plan on how you should conduct yourself. When you divorced it was obvious that—or we could say it was obvious that you weren't getting along at some level. And today we can truthfully say that y'all don't like one another very much. The State of Arkansas does not care that you don't like one another, at least in terms of the marriage that was split or dissolved some years ago. But when it comes to the children of the marriage, the State of Arkansas cares very much about how you're going to conduct yourselves toward one another because it has a significant impact on the children.
>
> Any . . . anyone knows that conflict between parents is going to negatively impact children, and . . . as far as the children are concerned, the two of you should conduct yourselves as if you were best friends and looking out for their best interest. At least, that's what they ought to see. Because . . . kids are smart. They get it. They're very intuitive, and they recognize the little signs, the body language, the tone of voice, the words used, all those sorts of things, and they pretty quickly figure out what's going on between mom and dad.

The court next addressed Ms. Grindstaff's wanting her new husband to attend her conversation with Mr. Strickland following the 2015 agreed order. The court stated that stepparents, even though part of the family makeup and in a relationship with the children, are not part of the decision-making process regarding the children. The court found that Ms. Grindstaff had "done a miserable job" of following the requirement to notify Mr. Strickland about events in the children's lives. The court noted her excuse that Mr. Strickland "never was interested before," but found that the burden was on both parents

SLIP OPINION

under the court's decree and visitation-schedule guidelines and that Mr. Strickland had "the right to be there" whether she wanted him to show up or not. Next, the court addressed communication between the parties:

> Your communication is miserable. I've read the e-mails, Ms. Grindstaff, and when you didn't want to talk about it, you just cut it off. She wasn't the only one. About the coats. Your [Mr. Strickland's] response to her, "You did not send them. End of discussion." That has got to stop. You two both need to grow up, particularly you, Ms. Grindstaff, and comport yourself as adults and communicate. You may not have to like one another, but you can be respectful and you can be cooperative and you can be courteous.

The court remarked, "One of the most horrible things that I think I heard here was "sign away your rights and my husband will adopt them." It noted that Mr. Strickland had not failed to participate in the children's lives or to pay child support. The court then assessed other evidence that had been presented in the hearing:

> He wants to be involved. And what I see from your behavior is you want to put a stick in the spokes every chance you can. You're uncomfortable because he's there— where you invited him—for the children's haircuts. Grow up. That's ridiculous. You say he won't foster the relationship between you and the children if he had custody. Well, I don't know. Maybe he won't, and . . . we'll be back here in court at some point in time to decide that possibly. Why wouldn't you give the address to the business where the kids are? What's unreasonable about that? . . . . When—we're talking about paragraph 6 in your decree. "The parties agree to jointly decide the following matters concerning the children: The medical decisions, school, and extracurricular activities." Your response was, to the question [on cross examination], "I have not done it 100 percent of the time. I'm working on it. It was not how it was meant." . . . .
>
> I . . . don't understand the rigid imposition of the times. He picks up the children early at 5:10; by golly, he's got to have them back at 5:10 on Sunday. I don't get it. "We have agreed," you said at one point in time. It sounds like it was a unilateral agreement. You did the imposing of what we're going to agree to. [Yes], if there is a change, it would be the third school in a year so—well, you're the one that moved initially. You created two of those school situations.
> Cohabitation in the household. I mean, it's all right between Ms. McGraw and your father-in-law how they live, but . . . that sets an example for the children. That's the point of that provision and why we don't want that sort of thing. Even

though those two older folks may be just happy as punch and present themselves well, the kids will figure it out.

And then, of course, we have the school forms that you either don't know how to figure out —or didn't know how to figure out, or you don't know how to fill them out, or you weren't going to fill them out to reflect Mr. Strickland's role in all of this.

Stating that probably none of these things alone would tip the scale, the court looked at the "cumulative effect" of Ms. Grindstaff's behavior over the last couple of years. The court was "fully convinced" that Ms. Grindstaff had done everything she could to "impact" Mr. Strickland's relationship with their children but he had been "pretty steadfast" in trying to maintain it, which had led to his present good relationship with the children. The court reiterated, "But it's the cumulative effect that causes me to do what I'm doing, and custody of the children changes immediately . . . ."

It is not our role to conduct a trial de novo and to consider questions of fact and issues of law as if there had been no trial. *Montemayor v. Rosen*, 2015 Ark. App. 597, at 11– 12, 474 S.W.3d 114, 119–20. The trial court, which was in the superior position to evaluate the credibility of the witnesses, was required to weigh the conflicting evidence presented at the hearings. *Id*.

Although there was evidence supporting Ms. Grindstaff's concerns, there was also evidence contradicting or explaining these concerns. The trial court noted its own concerns, such as Ms. Grindstaff's rigid imposition of times for visitation exchanges, her failure to show Mr. Strickland as a parent on school forms, her failure to always follow their previous agreement to jointly decide certain matters concerning the children, her suggestion that he give up his parental rights, and her "miserable job" of communicating with him. We conclude on de novo review that there was sufficient evidence from which the trial

court could have found a material change of circumstances. Accordingly, we hold that the circuit court's decision on this matter was not clearly erroneous.

II. *Whether the Trial Court Erred in Finding that a Change of Custody Was in the Children's Best Interest*

Ms. Grindstaff admits that she has not always made good decisions, but she argues that there was no testimony that the children had seen or heard any of the conduct recited by the trial court as a basis for its best-interest finding. She argues that there was no testimony that those actions had an adverse effect on the children and "not a single bit of testimony" that they were not doing well. She notes that both parties testified that the children were doing well, and Mr. Strickland testified he had a good relationship with them. She states that the children had been in her custody since the 2014 divorce and that changing custody would disrupt the children's lives, specifically, with one child's third change in a year and a second change for the other child. She relies on such cases as *Calhoun v. Calhoun*, 84 Ark. App. 158, 161–62, 138 S.W.3d 689, 691 (2003), in which the trial court found that the noncustodial parent had met her threshold burden of showing a material change in circumstances, and we held that the court, rather than simply weighing the child's best interest, incorrectly placed on appellant the additional burden of showing an "adverse impact" on the child.

Here, Mr. Strickland testified that he felt his relationship with the children had been damaged by Ms. Grindstaff's coaching them to snoop by trying to figure out pass codes to his phone and go through his texts; by her dismissive treatment of him in the children's presence; and by her interfering in his conversations with them. He testified that there was

a "vast difference" in the younger child's open and playful behavior with Mr. Strickland and his wife, compared to being with Ms. Grindstaff and her husband:

> When I attended [the child's] enrollment for Susan Knapp Academy, he would not approach me whatsoever. He stood next to Mike and Kim with his head down. It took approximately 20 to 30 minutes before he would even acknowledge I was standing there. He would look at me and then look back down.

Mr. Strickland also testified that the older child currently needed help in school because of being below average on math and reading and that the younger child was doing okay, but was slightly disruptive.

We find no support for Ms. Grindstaff's argument that, because there was no testimony that the children were aware of or suffered from her poor choices, the trial court erred in finding that it was in the best interest of the children to modify custody. Once the noncustodial parent has established a material change in circumstances, the court itself is to weigh the best interest of the child to determine which parent shall serve as the custodian of the child. *See Calhoun*, 84 Ark. App. at 163, 138 S.W.3d at 692 (refusing to hold that the trial court, in making its best-interest determination "cannot consider" whether the material change in circumstances had an adverse impact on the child). Having conducted our de novo review, we hold that the trial court did not clearly err in its best-interest analysis.

III. *Whether the Trial Court Erred in Changing Custody Before Using its Contempt Powers*

While a trial court has at its disposal the power to hold a party in contempt as a first step, there is no requirement that the court do so. *Evans v. McKinney*, 2014 Ark. App. 440, at 7, 440 S.W.3d 357, 360–61. It is true that custody is not awarded to punish, reward, or gratify the desires of either parent. *Elliott v. Skaggs*, 2013 Ark. App. 720, at 15, 430 S.W.3d 837, 845. However, whether one parent is alienating a child from the other is an important

11

factor to be considered in change-of-custody cases because a caring relationship with both parents is essential to the child's healthy upbringing. *Id.*

Here, the ad litem and the trial court were concerned about the effect that alienation and Ms. Grindstaff's failure to communicate had on Mr. Strickland's relationship with their children. The ad litem, noting Ms. Grindstaff's repeated behavior and violation of court orders, specifically recommended it was in the children's best interest that the court change custody rather than hold Ms. Grindstaff in contempt. We note that the court separately found her in contempt and punished her by requiring the payment of fees. We hold that the court did not err by choosing not to use its power to hold her in contempt as a step preceding the change of custody.

Affirmed.

VIRDEN and HARRISON, JJ. agree.

*Rhoads Law Firm*, by: *Johnnie Emberton Rhoads*, for appellant.

*Keith, Miller, Butler, Schneider & Pawlik, PLLC*, by: *Mason L. Boling*, for appellee.